# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# URBANA DIVISION

| | |
|---|---|
| **STEED E. WELFORD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Case No. 10-CV-2003 |
| ) | |
| **CATERPILLAR INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#14) filed by Defendant, Caterpillar Inc. (Caterpillar). This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, Caterpillar's Motion for Summary Judgment (#14) is GRANTED.

## FACTS[1]

Plaintiff, Steed E. Welford, is African-American. He was hired by Caterpillar in August 2000 and currently works at Caterpillar's Decatur, Illinois manufacturing facility as a labor grade 4 Quality Auditor. Plaintiff has never been reprimanded or disciplined while at Caterpillar.

On March 27, 2008, Plaintiff arrived at work at 5 a.m. He found an approximately 8 to 10 inch object made from wire ties in the form of a hangman's noose taped to a printer stand. The printer stand was located between Plaintiff's desk and the desk of a co-worker, Charles Bennett, who is Caucasian. Plaintiff took a picture of the object with a digital camera. The object was then

---

[1] The facts are taken from Caterpillar's statement of undisputed facts, Plaintiff's Response, and the documents submitted by the parties. This court has only included facts which are adequately supported by evidence in the record. This court notes that, in his pro se Response to Caterpillar's Motion for Summary Judgment, Plaintiff stated that he "has no knowledge" of some of the undisputed facts listed by Caterpillar. Because Caterpillar has provided evidentiary support for the listed facts, Plaintiff's response is inadequate to dispute these facts.

thrown in the trash by Bennett. Plaintiff and Bennett called their supervisor, Cindy Hale, and two other supervisors, Blake Fleming and Todd Berghoff, in response to finding the object. Plaintiff retrieved the object from the trash and showed it to Hale and Berghoff. At his deposition, Plaintiff testified that Hale and Berghoff were as shocked by the object as he was and told Plaintiff that they were "going to get to the bottom of it."

Within an hour or so, Hale told Plaintiff and Bennett to go to human resources (HR) to be interviewed about the incident. HR Manager Kathy Mock had directed Employee Relations Manager John Hubert to perform an investigation to determine who placed the "hangman's noose" object in the auditor's workstation. Hubert interviewed Plaintiff and Bennett about the incident. Hubert then asked Bennett to leave and spoke with Plaintiff alone. Hubert asked Plaintiff whether he believed that Bennett or David Young, a second shift auditor, might have been responsible for placing the object in the workstation. Plaintiff told Hubert he did not think either was responsible. Hubert told Plaintiff that the matter would be investigated. He also told Plaintiff that Caterpillar was sorry this had happened to him, but they may not be able to find out who did it. Hubert also met with Brandon Goforth, an African-American assembler who worked in the area, to find out if Goforth had any ideas about who might have been responsible for placing the wire structure in the area. Goforth did not identify any suspects.

Later the same day, Plaintiff attended a meeting called by Blake Fleming, the motor grader assembly line supervisor. Fleming called the assembly line employees together to address the object found that morning and to tell the employees that there was "zero tolerance" for that type of behavior. Plaintiff testified that he thought Fleming said the right things to the assembled employees. Fleming told Hubert that, at the meeting, he showed the employees a picture of the wire

2

structure and explained that the conduct was completely unacceptable. Fleming also told Hubert that he spoke individually with over 15 employees, but that none of them could provide information on who might be responsible.

That evening, Hubert spoke with second shift factory superintendent Tom Selby, second shift operations supervisor Josh Robbins, and third shift Operations General Manager Greg Gruber and told them to be alert for any mention of the noose structure having been placed in the area.

Plaintiff worked the balance of his shift that day, which was a Thursday, and also worked the next day, a Friday. On Friday, Plaintiff had a conversation with Young, and Young denied responsibility for placing the object in the workstation. Plaintiff told Young that he did not think Young would do it. Plaintiff worked every day the next week. The following Monday, April 7, 2008, Plaintiff reported directly to the medical department to get the paperwork necessary to take a medical leave of absence. He had the paperwork filled out by his personal doctor and returned it to the plant the same day. Plaintiff was granted a medical leave of absence and remained off work until May 12, 2008. Plaintiff testified that, when he returned to work, he did not want to go back to his old area. He was assigned to work in a different building, Building W. Plaintiff testified that there was nothing he did not like about the work in Building W.

While Plaintiff was on leave, the investigation continued. Hubert followed up with Gruber and Shelby who told him that they spoke to 25 to 30 employees who worked in and around the area to find out if they saw or knew anything related to the incident. They told Hubert that they were not able to gain any useful information in determining who was responsible. On April 1 and 2, 2008, Hubert, Mock and the Decatur facility Operations Manager Thea Robinson met with all supervisors on all shifts and made them aware of the incident. Hubert stated in his affidavit that, during these

3

meetings, they emphasized the inappropriateness of the act, its impact on the work group, and the supervisor's role in immediately addressing this type of inappropriate conduct. They also informed the supervisors that any information related to the incident should be reported to HR.

On April 23, 2008, Monica Ratcliff, Caterpillar Behavioral Health Coordinator, told Hubert that Plaintiff believed the employees' collective bargaining representative, the United Automobile Workers Union (UAW), knew the identity of the person who placed the wire structure in his area. Hubert stated that, in response to this report, he met with David Hess, UAW Local Bargaining Chairman, and asked him if he had any information regarding the matter. Hess denied any knowledge of who was responsible.

On or about May 6, 2008, Anita Holmes and Roger Walker from HR interviewed 12 additional employees about the incident. Through these further interviews, it was ultimately determined that Young had made the wire structure and placed it in the workstation. Young denied that his actions were in any way racially motivated. Young was placed on indefinite suspension and his employment was later terminated, effective May 28, 2008.

Caterpillar maintains a Prohibited Harassment Policy. Dianne Endrizzi stated in her Declaration that she works in personnel services at Caterpillar's Decatur facility. She stated that, since February 2003, she has had direct responsibility for issues concerning Caterpillar's equal employment opportunity policies, which includes the administration of Caterpillar's Prohibited Harassment Policy (Policy). Endrizzi stated that, in the spring of 2008, copies of the Policy were posted in various conspicuous locations around the Decatur facility. In general, the Policy sets forth Caterpillar's commitment to maintaining a work environment that is free of illegal harassment or discrimination, including harassment or discrimination based on race or sex. The Policy states that

4

any employee who witnesses or experiences illegal harassment should immediately notify the area supervisor, Department Manager, Corporate human resources, the Decatur facility EEO coordinator or the local facility human resources staff.

Endrizzi stated that all new employees receive training on the Policy as part of Caterpillar's new employee orientation. The training materials specifically address what conduct is prohibited by the Policy, including "conduct, comments, gestures, pictures, or teasing that belittles or shows hostility towards an individual because of their 'protected class' status." The training materials list the protected classes, including "race" and "color." The training materials further explain to whom employees may report violations of the Policy and that retaliation against persons who bring complaints under the Policy is prohibited.

In his Declaration, Hubert stated that all supervisors receive training on the Policy as part of their supervisor training curriculum. The training materials used to train supervisors on the Policy identify the following expectations for supervisors: (1) make sure your employees are aware of the Policy; (2) be a positive role model; (3) show no tolerance for inappropriate behavior; and (4) involve HR.

Endrizzi stated that employees go through refresher training on the Policy on a periodic basis. Plaintiff testified that Caterpillar held these meetings "annually or every so often." He testified that he recalled being told in these meetings that there was "[z]ero tolerance to harassment of any kind." Plaintiff testified that he also recalled seeing a copy of the Policy posted on the bulletin board. Plaintiff testified that he knew there were a number of places he could go to make a complaint about harassment, including HR, the labor relations department, his union steward or his supervisor. Endrizzi stated that Caterpillar's records show that Young attended refresher training

5

on Caterpillar's Policy in October 2005.

PROCEDURAL HISTORY

On January 6, 2010, Plaintiff filed a pro se Complaint (#1) against Caterpillar under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Plaintiff claimed that he was subjected to discrimination and harassment. He alleged that he arrived at work early on March 27, 2008, and found a hangman's noose at his work station. He alleged that Caterpillar did not adequately respond to this incident, causing him severe emotional distress. Plaintiff attached a copy of the Dismissal and Notice of Rights issued by the Equal Employment Opportunity Commission (EEOC) on October 19, 2009, and a copy of a photograph of the noose. Plaintiff stated that he was seeking restitution for pain and suffering and punitive damages. On March 30, 2010, Caterpillar filed an Answer and Affirmative Defenses (#10).

On December 30, 2010, Caterpillar filed its Motion for Summary Judgment (#14) and supporting Exhibits (#15). Caterpillar argued that, based upon the evidence and the applicable case law, it is entitled to judgment as a matter of law on Plaintiff's claims. Caterpillar stated that it does not deny that Plaintiff and a co-worker discovered an object in the form of a hangman's noose in their workstation on March 27, 2008. Caterpillar also stated that it does not dispute that the act of forming this offensive object and placing it on the factory floor was grossly inappropriate and in violation of its well-publicized Prohibited Harassment Policy. Caterpillar argued, however, that this isolated incident was insufficient to establish the existence of severe or pervasive race-based harassment necessary to support a finding of liability under a hostile work environment theory. Caterpillar also argued that Plaintiff cannot impute liability for this act to Caterpillar because Caterpillar maintains a Policy banning such acts and took prompt remedial measures to insure that

similar acts would not occur in the future. Caterpillar noted that its investigation ultimately discovered the co-worker responsible for the action, and the co-worker's employment was terminated.

On February 3, 2011, Plaintiff filed his pro se Response to Caterpillar's Motion for Summary Judgment (#18), with attached supporting exhibits. On February 17, 2011, Caterpillar filed its Reply to Plaintiff's Response (#19) and additional exhibits (#20).

ANALYSIS

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Singer v. Raemisch, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See Singer, 593 F.3d at 533.

The party opposing summary judgment may not rely on the allegations contained in the pleadings. Waldridge, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004).

7

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, "the nonmoving party must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 322-23.

LIABILITY FOR RACIAL HARASSMENT

In his pro se Response to Caterpillar's Motion for Summary Judgment, Plaintiff stated that the hangman's noose he found on his workstation "was not the only act of a racially hostile work environment." Plaintiff also argued that Caterpillar was negligent in its investigation and did not perform a thorough or proper investigation. In support of his arguments, Plaintiff attached a "Notification of Results of Investigation" (Notification) issued by the United States Department of Labor's Office of Federal Contract Compliance Programs (OFCCP). Plaintiff also attached a copy of the picture of the noose and a copy of the transcript of his deposition.[2]

In its Reply, Caterpillar argued that this court should not consider the Notification as evidence which supports Plaintiff's claim. This court agrees. The Notification attached to Plaintiff's Response is dated December 30, 2009, and was issued regarding a complaint filed with the OFCCP in May 2006 by a different Caterpillar employee, Larry Turpin. The OFCCP conducted an investigation in 2008 regarding Turpin's complaint and also investigated other allegations of

---

[2] This court notes that Caterpillar had already provided a copy of the transcript of Plaintiff's deposition with its exhibits in support of its Motion for Summary Judgment.

racial discrimination and racial harassment, including the incident involving Plaintiff. While the report concluded that "[d]iscrimination was not found" regarding most of the incidents investigated, the report concluded that "[t]here has been a racially hostile environment at Caterpillar." The report also concluded that "Caterpillar has not adequately responded to complaints about race-based treatment and hostility and has failed to take prompt corrective action." Regarding the incident involving Plaintiff, the Notification stated:

> When the noose was found in March, 2008 by [Plaintiff], although there were some initial questions asked of people in the immediate area, the matter was dropped by the Human Resources staff fairly shortly without any resolution. The company did not address employees generally, or those in the area where the noose was found, to assure them that such behavior was not to be tolerated. Employees in the area informed OFCCP that although some had been pulled aside to answer questions by Human Resources, they did not receive a strong message from Caterpillar that any such behavior warranted the strictest of discipline. Indeed, the perpetrator was not found or disciplined until several weeks later, in May, after OFCCP mentioned the incident to counsel representing Caterpillar; they had not previously been apprised of it. Once counsel started raising questions and it was understood that this had to be taken seriously, the perpetrator was readily identified.

A district court judge has "great discretion" in the treatment of an administrative

9

determination regarding discrimination. See Silverman v. Bd. of Educ. of the City of Chicago, ___ F.3d ___, 2011 WL 941518, at *1 (7th Cir. March 21, 2011). In Silverman, the district court granted summary judgment in favor of the employer and, in doing so, did not consider an EEOC determination finding reasonable cause to believe that the employer had discriminated against the plaintiff and retaliated against her for filing a discrimination charge. Silverman, 2011 WL 941518, at *1. The Seventh Circuit affirmed, and specifically held that the district court did not abuse its discretion in deciding that the EEOC determination was not probative in its analysis. Silverman, 2011 WL 941518, at *2. The court noted that neither the district court nor a jury could evaluate the weight an EEOC determination deserves, if any, "without understanding what evidence was presented to the EEOC and whether that evidence is properly admissible in court." Silverman, 2011 WL 941518, at *2, citing Tulloss v. Near N. Montessori Sch., Inc., 776 F.2d 150, 154-55 (7th Cir. 1985). The court also pointed out that the parties had every opportunity to present their full case, including the evidence offered in the EEOC proceedings, in the district court. Silverman, 2011 WL 941518, at *2.

In this case, the OFCCP's determination regarding the investigation of Plaintiff's claim is directly contradicted by the evidence provided to this court by Caterpillar, including Plaintiff's own deposition. Plaintiff testified that, the same day that he found the noose, he attended a meeting called by Blake Fleming, the motor grader assembly line supervisor. Plaintiff testified that Fleming called the assembly line employees together to address the object found that morning and to tell the employees that there was "zero tolerance" for that type of behavior. Plaintiff testified that he thought Fleming said the right things to the assembled employees. In addition, Caterpillar has provided evidence showing that its investigation was extensive, involving the interviews of

10

numerous employees, and was ultimately successful. Further, there is no way to know what evidence the OFCCP did or did not consider in making its determination. In addition, in its Reply, Caterpillar has pointed out that the Notification Plaintiff attached to his Response was formally rescinded by letter dated June 3, 2010 and was replaced with a revised Notification dated June 2, 2010. While the language this court quoted remained in the replacement Notification, much of the background information was omitted and other significant changes were made. This court agrees with Caterpillar that this is an additional reason to question the validity of the OFCCP's Notification. This court therefore concludes that the OFCCP's Notification cannot be considered evidence that there was a racially hostile environment at Caterpillar or that Caterpillar's investigation of the noose incident was inadequate. This court, in exercising its discretion, concludes that it will not consider the OFCCP's Notification in ruling on Caterpillar's Motion for Summary Judgment. See Silverman, 2011 WL 941518, at *2; Lewis v. City of Chicago Police Dep't, 590 F.3d 427, 442 (7th Cir. 2009); Young v. James Green Mgmt., Inc., 327 F.3d 616, 623-25 (7th Cir. 2003); Tulloss, 776 F.2d at 154; see also Vaughn v. Louisville Water Co., 302 Fed. Appx. 337, 347 (6th Cir. 2008) (in affirming the district court's grant of summary judgment for employer, court concluded that OFCCP's Notification did not bolster the plaintiff's claim and was insufficient to establish a genuine dispute of material fact).

This court notes that, during his deposition, Plaintiff complained that he was subjected to other harassment because of his race and specifically discussed transfers to different locations within the plant, offensive writings in restrooms and offensive comments which were not directed to him. Plaintiff testified, however, that he did not report or complain about any of these incidents. Caterpillar cannot be liable for incidents that were never reported. It is undisputed that Caterpillar

11

had a Policy prohibiting harassment and discrimination on the basis of race and set out specific methods for reporting harassment or discrimination. Plaintiff had a duty to reasonably "'avail [him]self of the employer's preventive or remedial apparatus.'" Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 637-38 (2009), quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). In addition, Plaintiff's pro se complaint only included allegations regarding the hangman's noose. Therefore, this court agrees with Caterpillar that the only incident at issue in this case is the hangman's noose found on March 27, 2008.

"To survive summary judgment, an employee alleging a hostile work environment must show that: '(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.'" Porter, 576 F.3d at 634, quoting Williams v. Waste Mgmt. of Ill., Inc., 361 F.3d 1021, 1029 (7th Cir. 2004). Because this court concludes that Plaintiff has not shown a basis for employer liability, this court does not need to determine whether this incident was sufficient to show actionable harassment. See Porter, 576 F.3d at 636-39 (finding no basis for employer liability, but noting that the "noose is a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs" and that several courts have concluded that a noose may constitute part of a hostile environment claim).

As far as the question of employer liability, it is well settled that Title VII is not a strict liability statute. Porter, 576 F.3d at 636; see also Tutman v. WBBM-TV, Inc./CBS, Inc., 209 F.3d 1044, 1048 (7th Cir. 2000). Therefore, when a plaintiff "'claims coworkers alone were responsible for creating a hostile work environment, he must show that his employer has been negligent either

in discovering or remedying the harassment.'" Porter, 576 F.3d at 636, quoting Williams, 361 F.3d at 1029. In other words, "the employer can avoid liability for coworker harassment 'if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'" Porter, 576 F.3d at 636, quoting Tutman, 209 F.3d at 1048. An employer can show that it took reasonable corrective action by conducting a prompt investigation. See Porter, 576 F.3d at 636; see also Tutman, 209 F.3d at 1049.

Caterpillar has argued that it performed a reasonable investigation of the incident, culminating in the termination of David Young. This court agrees because the undisputed evidence supports this conclusion. The evidence shows that Caterpillar has a Policy prohibiting this type of conduct and the Policy was posted and discussed in training sessions with employees and supervisors. The evidence also shows that Caterpillar took the incident seriously and took immediate actions to investigate the incident and inform employees that there was "zero tolerance" for that type of conduct. Numerous employees were interviewed during the course of the investigation. It did take a significant amount of time for Caterpillar to identify the person responsible. However, the investigation was ultimately successful and the responsible person was identified and disciplined.

Plaintiff has argued that the investigation was flawed because Young was an early suspect but was not determined to be the perpetrator until weeks later. This court notes, however, that the evidence shows that Plaintiff did not believe that Young was responsible at the beginning of the investigation and Young denied responsibility. Once Young was determined to be responsible through further investigation, he was suspended on May 6, 2008, and his employment was terminated on May 28, 2008. This court concludes that the undisputed evidence shows that

Caterpillar took the incident seriously and took appropriate steps to bring the harassment to an end. See Porter, 576 F.3d at 636. Based on this record, this court concludes that a reasonable trier of fact could not conclude that Caterpillar was negligent in investigating or responding to the harassment of which it had knowledge. See Porter, 576 F.3d at 639. An investigation does not have to be "textbook in its execution" to be adequate to have the purpose and effect of eliminating further race-based harassment. Williams, 361 F.3d at 1030.

Because Plaintiff has not presented any evidence to this court sufficient to raise a genuine dispute of material fact regarding whether there is a basis for employer liability on the part of Caterpillar, Caterpillar is entitled to summary judgment on Plaintiff's claim.

IT IS THEREFORE ORDERED THAT:

(1) The Motion for Summary Judgment (#14) filed by Defendant Caterpillar Inc. is GRANTED. Judgment is entered in favor of Caterpillar and against Plaintiff on all of Plaintiff's claims.

(2) On April 18, 2011, this court entered a text order and vacated the final pretrial conference scheduled for May 6, 2011, at 2:30 p.m. and the bench trial scheduled for May 16, 2011, at 9:00 a.m.

(3) This case is terminated.

ENTERED this 21st day of April, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE